Filed 1/21/26  P. v. Mendoza CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|                                   |                               |
| --------------------------------- | ----------------------------- |
| THE PEOPLE,                       | 2d Crim. No. B338259          |
|                                   | (Super. Ct. No. BA332081)     |
| Plaintiff and Respondent,         | (Los Angeles County)          |
|                                   |                               |
| v.                                |                               |
|                                   |                               |
| JUAN MENDOZA,                     |                               |
|                                   |                               |
| Defendant and Appellant.          |                               |

Juan Mendoza appeals after the trial court denied his petition for resentencing under Penal Code section 1172.6.[1]  He contends the evidence at the section 1172.6, subdivision (d)(3) hearing was insufficient to prove beyond a reasonable doubt that

---

[1] Undesignated statutory references are to the Penal Code. Appellant filed a petition citing section 1170.95.  Effective June 30, 2022, the Legislature renumbered section 1170.95 as section 1172.6, without substantive change.  (Stats. 2022, ch. 58, § 10.) We refer to the statute throughout as section 1172.6.

he could still be convicted of murder under a valid theory of liability after the amendments to sections 188 and 189, effective January 1, 2019.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

"Jesse Gonzalez ran a used car business called Jesse's Auto Sales in East Los Angeles.  About two years before the murders, Gonzalez's former son-in-law, Michael Ibarra, washed cars for him for about a month. . . .  [Appellant's brother] Angel believed that Ibarra had something to do with the death of [appellant's and Angel's] brother because Ibarra had laughed when it happened.

"Jonathan Van Dyke . . . met appellant at an 'involuntary residential program' called the Lighthouse Alvarado.  The program had a mentoring program in which Van Dyke was appellant's 'strength.'  The day before the murders, appellant and Van Dyke left the program and picked up appellant's truck in Alhambra.  They drove to [Salvador] Viescas's house in East Los Angeles. . . .  [Viescas] and appellant went into the bedroom and closed the door.  They came out after about 10 minutes. Appellant and Van Dyke returned to the Lighthouse Alvarado.

"The next day, appellant and Van Dyke again left the program and took appellant's truck to Viescas's house.  On the way there, appellant told Van Dyke that a woman had robbed him of some money 'and he was going to get it back' by going to the car dealership where her family worked.  He was looking for

---

[2] We quote, with modification, from this court's unpublished opinion in *People v. Mendoza* (Mar. 3, 2016, B249627) [nonpub. opn.].  On our own motion, we take judicial notice of the record in appellant's direct appeal, including the reporter's and clerk's transcripts.  (Evid. Code, §§ 452, subd. (d), 459.)

two 'punks'—the woman's cousins—who worked there. Van Dyke assumed this meant appellant was going to rob the dealership. Appellant asked Van Dyke what he 'wanted out of it.' Van Dyke said, 'Just a car.'

"When they got to Viescas's house, appellant told Viescas and Van Dyke 'to go look and see who was there' at the dealership. They agreed. Appellant and Van Dyke then left to pick up Angel at a construction site in Glendale so that appellant 'wouldn't have to do this alone.' The three of them returned to Viescas's house. Appellant told Van Dyke and Viescas to go to the dealership, see who was there, and call them on a 'burn' phone, i.e., one with a stolen 'chip.'

"Van Dyke and Viescas walked down an alley to Jesse's Auto Sales, where they saw two of Gonzalez's salesmen, Arturo Saldana and Francisco Cereceres. After two or three minutes, they left through the alley. Viescas called appellant and told him that there were just 'two old guys' at the dealership and that he and Van Dyke were on their way back.

"Appellant called back and told them, 'Hurry up and get your ass back' to the dealership. . . . [When Van Dyke returned to the dealership, he saw appellant] had blood on his clothes and hands. [Appellant] said, 'Take my brother and [Viescas], and I'll meet you guys.' Appellant was holding three sets of keys and a wallet. Van Dyke took the keys to a Jeep Grand Cherokee that he had seen earlier and liked. He got into the car along with Angel and Viescas. Angel also had blood on his clothes and was holding a small caliber pistol in his lap.

"Viescas directed Van Dyke to drive to West Covina. They were running low on gas, so Van Dyke pulled into a gas station. Angel gave him the wallet he was holding. Van Dyke tried to use

a credit card from the wallet to get gas but could not figure out the correct zip code to enter.  Viescas directed him to a house a few blocks away.

"Viescas spoke with a man at the house.  Appellant arrived about 45 minutes later in a white Dodge Dakota.  He parked in the garage.  He told Van Dyke to wipe down the car to get rid of blood and fingerprints.  Appellant and Angel removed their clothes and put them in a trash bag.

"Van Dyke asked appellant what happened at the dealership.  Appellant told him, 'Don't worry.  We got them.'  When Van Dyke asked who he 'got,' appellant said, 'the dudes that were there.'  Van Dyke asked him if [he] was 'talking about the old guys,' appellant said, 'Yes. . . .  They're not going to be talking to anybody.'  Van Dyke, believing appellant meant that they had killed Saldana and Cereceres, said, 'I'm gone.'  Van Dyke picked up a checkbook from the dealership that appellant had brought in from the Dakota and drove off in the Jeep.  When he got to Highland Park, he tried unsuccessfully to cash one of the checks.  He parked the car on a back street at the top of a hill and wiped it down.  He then locked the car and threw the keys into a storm drain.

"Carlos Jauregui . . . was at home in Montebello on the day of the murders.  Angel showed up, and Jauregui drove him to his (Angel's) grandmother's house.  Angel told Jauregui that he . . . had killed [Jesse Gonzalez] and another person.  Later, Angel realized it was not [Gonzalez] whom he had killed.

"Angel told Jauregui that when appellant picked him up from work, he wanted to borrow his gun because 'he was going to go get [Ibarra].'  He also wanted to commit a robbery.  Angel said that when [they] were committing the robbery at the dealership,

4

two men lunged at [Angel]. Angel grabbed something used for washing cars and started hitting one of them on the head. He shot both men in the head. Afterwards, he took a car, which he left near a Kmart or Target. He disassembled the gun and threw away the pieces. Later that day while watching a television news story about the murders, Angel told Jauregui he had done that.

"When Gonzalez returned to the dealership after his lunch break, he discovered the victims' bodies lying in a pool of blood. A white Dodge Dakota and a Jeep Grand Cherokee were missing from the lot. A checkbook was missing from the office. Saldana's wallet was also missing. Saldana and Cereceres had abrasions all over their bodies. Saldana had two broken ribs. His injuries were consistent with being beaten by a metal hose nozzle. Both died of gunshot wounds. . . ." (*People v. Mendoza*, *supra*, B249627.)

"A jury convicted appellant . . . of two counts of first degree murder. (§§ 187, subd. (a), 189.) The jury found true special circumstances allegations that he committed multiple murders (§ 190.2, subd. (a)(3)) during the commission of a robbery, burglary, and carjacking (§ 190.2, subds. (a)(17)(A), (G), (L)). The jury further found true allegations that he used and discharged a firearm (§ 12022.53, subds. (b)-(e)(1)) and committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced him to two consecutive terms of life in prison without the possibility of parole plus two consecutive terms of twenty-five years to life for the gun use enhancements." (*People v. Mendoza*, *supra*, B249627.) On direct appeal, we affirmed the judgment. (*Ibid*.)

In 2022, appellant filed a petition for resentencing under section 1172.6. The court appointed counsel, and the People

conceded appellant had established prima facie eligibility. At the evidentiary hearing under section 1172.6, subdivision (d)(3), the court admitted reporter's and clerk's transcripts of the trial. Appellant objected to portions of the gang expert's testimony as inadmissible hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665. The court overruled the objection but indicated it was "not considering this evidence for any purpose at all."

At the hearing, Angel testified he shot the two men in the garage. Appellant, Carlos Piaskas, and Van Dyke were across the street. Angel had not shown his firearm to any of them. The plan was to tie up the victims and rob the dealership.

Angel was looking for Michael Ibarra because he wanted to beat up Ibarra and "find out what he had to do with" the death of Angel's brother. Although he did not tell appellant, killing Ibarra "was on [Angel's] mind."

Angel went into the garage and asked if Ibarra was there. After one of the victims said no, Angel took out the firearm, and that victim "launched" at Angel. They fell to the floor, and the victim screamed for the other victim, who jumped on Angel's back. Angel ultimately shot both victims.

The trial court concluded Angel's testimony was "a total fabrication." The court found appellant was a major participant who acted with reckless indifference to human life. The court further found appellant acted as a direct aider and abettor to implied malice murder. The trial court denied the petition for resentencing.

## DISCUSSION

"Effective January 1, 2019, Senate Bill . . . 1437 . . . significantly limited the scope of the felony-murder rule and eliminated liability for murder under the natural and probable

6

consequences doctrine . . . ." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 122; Stats. 2018, ch. 2015, §§ 1-3.)  Now, "[a] person who did not kill or act with the intent to kill can be liable for murder under the felony-murder doctrine only if he or she 'was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.'" (*People v. Emanuel* (2025) 17 Cal.5th 867, 880 (*Emanuel*); § 189, subd. (e)(3).)

Section 1172.6 sets forth the procedure for defendants convicted under prior law to petition for relief.  (§ 1172.6.)  The process "begins with a facially valid petition that entitles petitioner to counsel, continues with asking whether petitioner has made a prima facie case for relief, and, if so, proceeds to an evidentiary hearing on the ultimate question of whether petitioner should be resentenced."  (*People v. Patton* (2025) 17 Cal.5th 549, 562; § 1172.6, subds. (a)-(d).)

At the evidentiary hearing, the prosecutor must "'prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under state law as amended by [Senate Bill 1437]." (*Emanuel*, *supra*, 17 Cal.5th at p. 880; § 1172.6, subd. (d)(3).)  We review denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence.  (*Emanuel*, at p. 885.)  "Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988; see also *People v. Oliver* (2023) 90 Cal.App.5th 466, 479-480 [independent standard of review in *People v. Vivar* (2021) 11 Cal.5th 510 inapplicable to

7

question of whether defendant was a major participant who acted with reckless indifference to human life].)

In his reply brief, appellant indicates he does not contest that he acted as a major participant in the underlying felonies. Appellant argues "the evidence failed to establish beyond a reasonable doubt that [he] acted with reckless indifference to human life." (Bold and capitalization omitted.) We conclude substantial evidence supports the trial court's finding that appellant acted with reckless indifference to human life.

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citations]." (*People v. Scroggins* (2020) 9 Cal.5th 667, 677.)

"'The degree of risk to human life is crucial to the analysis.'" (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) "To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, [*People v. Clark* (2016) 63 Cal.4th 522] 'set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration

8

of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.'" (*Ibid.*) Ultimately, "[t]he 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Id.* at p. 885.)

Appellant orchestrated the robbery. He recruited Van Dyke before picking up his brother Angel. Appellant knew Angel had a firearm—in fact, he wanted to borrow it because "he was going to go get [Ibarra]." Angel told appellant, "'No. No. I'll go. I got to do that.'" Ibarra had laughed when appellant's and Angel's brother was killed, and Ibarra "supposedly . . . [had] something to do with" the death. Thus, appellant did not merely participate in a "'"garden-variety armed robbery."'" (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) The revenge motive significantly elevated the risk to human life, even though Ibarra was not ultimately among the victims.

Whether or not appellant was present with Angel for the shooting, he was in the vicinity. After the murders, with blood on his hands and clothes, he gave Van Dyke a set of stolen car keys. Appellant later told Van Dyke: "'We got them. Don't worry. They're not going to be talking to anybody.'" Appellant, in other words, took ownership of the murders. Given appellant was 39 years old at the time, youth does not operate as a mitigating factor in this case. (Cf. *In re Moore* (2021) 68 Cal.App.5th 434, 454.) Under the totality of the circumstances, the record contains substantial evidence of appellant's reckless indifference to human life.

Appellant's reliance on section 1111, which requires corroboration of an accomplice's testimony, is misplaced. For a trier of fact "to rely on an accomplice's testimony about the

9

circumstances of an offense, it must find evidence that "'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime.'" . . . The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and "'may be circumstantial or slight and entitled to little consideration when standing alone'" [citation]." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32; § 1111.)

Here, assuming section 1111 applies, appellant's statements to law enforcement and in a recorded conversation with Angel and Van Dyke, along with Jauregui's testimony, provided more than enough corroboration. Jauregui's plea in a separate criminal case did not transform him into an accomplice in appellant's case under section 1111. (§ 1111 [accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given"].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.



CODY, J.

We concur:



YEGAN, Acting P. J.        BALTODANO, J.

10

Ronald S. Coen, Judge
Superior Court County of Los Angeles

_____

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Roberta L. Davis, Deputy Attorney General, for Plaintiff and Respondent.